* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms with modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. The employee died on November 5, 2002 and this claim was filed by James T. Flowers, the administrator of deceased-employee's estate (hereinafter "plaintiff").
3. Doris D. Garner, deceased-employee (hereinafter "decedent") worked at the H.K. Porter in Charlotte, North Carolina from January 1, 1966 until April 30, 1974. Decedent then worked for Southern Textile Corporation in Charlotte, North Carolina from May 1, 1974 until January 26, 1983, when it became Salprep II d/b/a Southern Manufacturing. Decedent was employed by Salprep II d/b/a Southern Manufacturing from January 27, 1983 until October 9, 1995. Salprep II d/b/a Southern Manufacturing was then purchased by M-Tec Corporation d/b/a Southern Manufacturing and decedent was employed by M-Tec from October 10, 1995 until decedent's last date of employment on July 31, 1999.
4. The carriers on the risk for the aforesaid employers during the period of decedent's employment were as follows: ACE USA (Cigna) from July 1, 1958 to August 1, 1973; Specialty Risk Services from August 1, 1973 to May of 1974; Liberty Mutual Insurance Company from August 8, 1974 to August 8, 1982; Hartford Underwriters Insurance Company *Page 3 
from July 1, 1995 to October 9, 1995; AIG Claim Services from October 10, 1996 to October 10, 1998; and Reliance Insurance Company from October 1, 1998 to November 1, 2000.
5. Reliance Insurance Company was declared insolvent on October 3, 2001 in an order of liquidation entered by the Pennsylvania Commonwealth Court. Following the insolvency of Reliance Insurance Company, the North Carolina Insurance Guaranty Association (the "NCIGA") activated to fulfill its statutory obligations pursuant to the requirements of the North Carolina Insurance Guaranty Act, N.C. Gen. Stat. § 58-48-1, etseq.
6. The parties are subject to the North Carolina Workers' Compensation Act and defendant-employers employed the requisite number of employees to be bound under the provisions of said Act.
7. The parties stipulated the following documents into evidence at the hearing before the Deputy Commissioner:
 (a) Industrial Commission Form 18B. (b) Industrial Commission Form 61 dated November 9, 2004, filed by Defendant Southern Manufacturing and Liberty Mutual Insurance Company.
 (c) Industrial Commission Form 61 dated November 11, 2004, filed by Southern Manufacturing and ACE USA.
 (d) Industrial Commission Form 61 dated March 7, 2005, filed by M-Tec Corporation and NCIGA.
 (e) Industrial Commission Form 61 dated October 14, 2004, filed by Salprep II d/b/a Southern Manufacturing and Hartford Underwriter's Insurance Company. *Page 4 
 (f) Industrial Commission Form 61 dated August 22, 2006, filed by H.K. Porter and Specialty Risk Services
 (g) Industrial Commission Form 33.
 (h) Industrial Commission Form 33R dated November 8, 2004, filed by H.K. Porter and Specialty Risk Services.
 (i) Industrial Commission Form 33R dated November 9, 2004, filed by Southern Manufacturing and Liberty Mutual Insurance Company.
 (j) Industrial Commission Form 33R dated November 11, 2004, filed by Southern Manufacturing and ACE USA.
 (k) Industrial Commission Form 33R dated January 20, 2005, filed by Salprep II d/b/a Southern Manufacturing and Hartford Underwriter's Insurance Company.
 (l) Industrial Commission Form 33R dated January 31, 2005, filed by Southern Manufacturing and AIG Claims Services.
 (m) Decedent's Report of Social Security Benefit Information.
 (n) Plaintiff's Responses to Defendant Southern Manufacturing and AIG Claims Services' First Set of Interrogatories and Request for Production of Documents.
 (o) Defendant H.K. Porter and ACE USA's Responses to Plaintiff's First Set of Interrogatories.
 (p) Letter dated November 11, 2004 from Hatcher Kincheloe, attorney for H.K. Porter and ACE USA.
 (q) Letter dated March 7, 2005 from William C. Delbridge of NCIGA. *Page 5 
 (r) Letter dated March 31, 2005 from Edward A. Sweeney, attorney for H.K. Porter and ACE USA.
 (s) Electronic mail dated August 9, 2006 from Edward A. Sweeney, attorney for H.K. Porter and ACE USA.
 (t) Electronic mail dated August 16, 2006 from Michael B. Pross, attorney for plaintiff with response from Edward A. Sweeney, attorney for H.K. Porter and ACE USA.
 (u) Social Security Earnings History Report.
 (v) Decedent's death certificate.
 (w) All medical records and/or medical bills concerning decedent, including but not limited to those from Stephen D. Harris, M.D., Denise E. Duff, M.D., Thomas Hauch, M.D., Steven H. Dikman, M.D., Donald Breyer, M.D., Bruce E. Fee, M.D., Ramesh M. Sharma, M.D., any physician(s) or health care provider(s) who have seen or treated decedent. All documents admitted into evidence at the Deputy Commissioner's hearing by way of stipulation are contained in Stipulated Exhibit 1, consisting of numbered pages 1 through 71.
8. The NCIGA and plaintiff submitted into evidence the following exhibits at the hearing before the Deputy Commissioner on December 22, 2006:
 (a) Copy of Order of Liquidation for Reliance entered by the Pennsylvania Commonwealth Court dated October 3, 2001 (NCIGA Ex. 1); *Page 6 
 (b) Copy of Order by Pennsylvania Commonwealth Court setting the deadline for the filing of claims and proofs of claim against the estate of Reliance in liquidation (NCIGA Ex. 2);
 (c) Letter dated January 24, 2005 from Michael B. Pross to defendant NCIGA (NCIGA Ex. 3);
 (d) Letter dated February 28, 2005 from Reliance, in Liquidation, to defendant NCIGA (NCIGA Ex. 4);
 (e) Letter dated March 7, 2005 from William C. Delbridge to Michael B. Pross (NCIGA Ex. 5);
 (f) NCIGA Form 61 Denial of Workers' Compensation Claim dated March 7, 2005 (NCIGA Ex. 6);
 (g) Minutes dates June 17, 1992 from North Carolina House Committee on Economic Expansion (Plaintiff Ex. X);
 (h) History of Senate Bill S 726 (Plaintiff Ex. Y); and
 (i) Minutes dated May 9, 1991 from North Carolina Senate Committee on Manufacturing and Labor (Plaintiff Ex. Z).
9. The issues for determination before the Deputy Commissioner were whether decedent contracted a compensable occupational disease of asbestosis and/or lung cancer and whether the disease contributed to decedent's death; when decedent was last injuriously exposed to the hazards of the alleged occupational disease; what, if any, benefits decedent's estate is entitled to receive, including attendant care; whether the compensation due plaintiff should be increased by ten percent pursuant to N.C. Gen. Stat. § 97-12; whether plaintiff is entitled to attorney fees for the unreasonable defense of this matter; whether defendant-employers of *Page 7 
decedent should be subject to sanctions; whether plaintiff is entitled to receive compensation pursuant to N.C. Gen. Stat. § 97-24(31); whether any defendant has waived its right to deny and/or defend this claim based upon a failure to comply with the terms and conditions as set forth in N.C. Gen. Stat. § 97-18 and Industrial Commission Rule 601; whether decedent's compensation rate was correctly found to be $229.27; whether Liberty Mutual Insurance Company had insurance coverage from February 18, 1983 to July 1, 1994 and October 10, 1995 to November 18, 1996; and whether plaintiff has a "covered claim" within the NCIGA's statutory obligations under the North Carolina Insurance Guaranty Act, N.C. Gen. Stat. § 58-48-35(a)(1).
10. The Deputy Commissioner was advised that plaintiff and all defendants, with the exception of the North Carolina Insurance Guaranty Association, settled their claims. The present Opinion and Award, therefore, addresses only the potential liability of NCIGA and whether plaintiff has a "covered claim" within the NCIGA's statutory obligations under the North Carolina Insurance Guaranty Act, N.C. Gen. Stat. § 58-48-35(a)(1).
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Decedent was employed by defendant-employers from January 1, 1966 to July 31, 1999. During that employment, raw asbestos was used in the manufacturing process at the facility where decedent worked. The use of raw asbestos in the manufacturing process at the facility ended in the 1980's, and no later than 1987. During his employment prior to 1987, decedent handled cloth which was made using raw asbestos. *Page 8 
2. After 1987, decedent continued to work in areas where asbestos was present. In 1995, decedent was personally monitored for asbestos exposure and was found to be exposed at that time to low levels of asbestos fibers, which were below the permissible OSHA limits.
3. Decedent worked in the treatment area of the facility. Prior to 1987, asbestos material was used in the products that were being made, and the machinery decedent operated generated a large amount of dust. Subsequent to 1987 and until the time decedent retired, there remained a large amount of asbestos material in the area he worked, causing air borne contamination from asbestos.
4. Decedent was diagnosed with small cell lung cancer in June 2002, and subsequently died as a result of that disease on November 5, 2002.
5. The undisputed evidence shows that decedent worked at defendant-employers' facility from October of 1966 to July 31, 1999. From October of 1966 to 1987, defendant-employers used asbestos in their products that were manufactured at the facility. Following, the removal of asbestos from the products of defendant-employers, there still remained a large amount of asbestos material in the area were decedent worked until he left the facility.
6. C.L. McClure was a supervisor at the facility from 1961 to 1985 and knew decedent. Mr. McClure testified that there were extensive amounts of asbestos used at the facility to make products. Mr. McClure further testified that he saw decedent working on a regular basis and that the process in which decedent was involved required decedent to handle and be within arms length of asbestos material throughout the time he worked with decedent. This process created large amounts of asbestos dust on a regular basis.
7. Grady Jerome Kiker worked for defendant-employers from 1965 through 1999. Mr. Kiker knew decedent and worked at the same facility as decedent. Mr. Kiker worked as an *Page 9 
electrician and sheet metal worker and believes that he was exposed to asbestos throughout the time he worked at the facility.
8. Mr. Kiker regularly saw decedent working around the facility and cleaning the ovens. To clean the ovens, decedent went into the ovens and blew the dust out with compressed air. These ovens were insulated and the ovens or dryers had ventilation ducts attached, which were referred to as "wheelabrators." The wheelabrators collected dust including asbestos dust. Decedent worked in the area Mr. Kiker described. Mr. Kiker was issued a dusty trades card and had one until the time he left the plant. Mr. Kiker stated that there were asbestos materials and insulation still in the plant as late as 1999. Mr. Kiker believes he was exposed to asbestos until he stopped working in the plant.
9. From at least 1995 to 1997, Gene Douglas Moore was employed by Delta Environmental Consultants, Inc. Mr. Moore's work involved environmental consulting and environmental science. As part of his job duties, Mr. Moore does asbestos consulting and collecting field data. He holds accreditations and certifications in air monitoring and asbestos air sampling.
10. In 1995, Mr. Moore did an initial asbestos survey entitled the Asbestos Identification Survey that assessed all the asbestos containing material in the facility where decedent worked. Mr. Moore again visited the facility in 1997 to evaluate the asbestos. Based upon the asbestos surveys conducted, Mr. Moore concluded that there was asbestos containing material in all departments throughout the facility in various conditions.
11. In the 1995 survey, Mr. Moore took small samples of the material and tested them to determine whether the material contained asbestos. Part of the survey was focused in the treating department where decedent worked. The survey found that the pipe insulation in the *Page 10 
treating department contained asbestos and linoleum. The survey further noted that "The asbestos-containing" pipe insulation was damaged and repair or removal by a licensed asbestos abatement contractor was recommended.
12. Mr. Moore opined that the pipe insulation was in a damaged and friable condition thereby potentially releasing asbestos fibers. Additionally, in the card room, Mr. Moore found areas with asbestos dust and debris. During his visits to the plant, he did not recall seeing any employees wearing respiratory protection. On the later visit in 1995, decedent was personally sampled for asbestos exposure and tests showed that decedent was exposed to asbestos fibers.
13. In 1997, Delta Environmental Consultants, Inc. visited the facility again. This time the purpose was to evaluate the procedures used by an asbestos abatement contractor. This survey confirmed that as late as 1997, there was a large amount of asbestos material still in the facility.
14. Decedent was exposed to asbestos fibers until the day he left the facility. The exposure was significantly greater at the beginning of his employment than at the end. Nevertheless, his exposure continued until the final day of his employment. 15. Defendant M-Tec Corporation d/b/a Southern Manufacturing owned the facility for the last four years that decedent worked there.
16. Dr. Steven Dikman is a pathologist and has been an expert in asbestosis related lung disease since the late 1960's. Dr. Dikman opined that decedent's exposure to asbestos at work was a significant contributing factor to his development of lung cancer. Dr. Dikman further stated that decedent's employment greatly increased his risk of developing lung cancer over that of the general public not so employed. In reaching his opinion, Dr. Dikman reviewed numerous medical records of decedent, including those of his treating physician, tissue samples *Page 11 
from the pleural aspect of the lung and the tumor itself, chest x-ray reports, along with statements from decedent's co-workers, and a copy of a letter sent by defendant-employer in 1987 indicating that it was stopping using asbestos in its products in 1987.
17. When Dr. Dikman reviewed the tissue samples of decedent and decedent's medical records, he found that decedent had evidence of pleural plaquing on the outside of his lung. This finding was confirmed on an operative report as well as a chest x-ray of decedent. Dr. Dikman described this plaquing as a chronic process of scarring on the outside of the lung, which indicates an exposure to significant amounts of asbestos.
18. Dr. Dikman also testified regarding the relationship between cigarette smoking and asbestos exposure, as it relates to the development of asbestos related cancer. Dr. Dikman explained in detail the synergistic effect of cigarette smoke and asbestos to the development of lung cancer. Dr. Dikman testified:
 Q. Now, Doctor, you mentioned two causes for this gentleman's development of lung cancer. And I know from the past that you talk about the synergistic effect of cigarette smoking and asbestos exposure. Could you describe for us what that is, Doctor?
 A. Yes. This a finding that was noted by Dr. Selikoff and individuals here as well as several other research centers around the world who have looked at the relationship between cigarette smoking and asbestos exposure and lung cancer. And they concluded that while cigarette smoking may be a leading cause in the general population for cigarette — for lung cancer, asbestos exposed workers have the effect alone of asbestos exposure, which can cause lung cancer by itself, but it is a multiplication of the factors of cigarette smoking and the asbestos exposure so that the risk for lung cancer, rather than being, say 10 or 20 times the general population, in the cigarette smoker would be 50 to 90 times the general population.
 Q. So 50 to 90 times greater if you're exposed to asbestos and if you have a cigarette smoking history, Doctor? *Page 12 
 A. Yes.
 Q. As opposed to simply the approximately 10 times if you're simply a cigarette smoker?
 A. Correct.
19. Dr. Dikman explained that it would be impossible to find asbestos fibers in the tissue samples provided because the tissue samples provided were from the pleural area of the lung, or the outside surface of the lung. In the sample, there was no tissue of the actual inside or parenchema of the lung to evaluate and this is where asbestos fibers would be found.
20. The medical records from decedent's treating physicians have numerous references to asbestos related findings. On June 26, 2002, Dr. Ramesh Sharma preformed an operative procedure on decedent that went into decedent's chest and looked at the pleural surface of decedent's left lung. Dr. Sharma found, "The apical and anterior portions exhibited marble like calcification typical of asbestos exposure." On May 28, 2002, Dr. Denise Duff read a CT scan of decedent's chest and found "Areas of parenchymal scarring." Dr. Dikman made similar findings when he looked at the tissue samples of decedent.
21. Additionally, decedent's lung cancer metastasized to his liver. This was demonstrated on a CT scan of his abdomen on August 8, 2002.
22. Defendants offered Dr. Victor Roggli as their expert in this case. Dr. Roggli agreed that asbestos can cause lung cancer and, in this case, he could not rule out the possibility that asbestos played a role in decedent's development of asbestos related lung cancer. Dr. Roggli also confirmed Dr. Dikman's opinions regarding the synergistic relationship between cigarette smoking and asbestos and the development of asbestos related cancer. *Page 13 
23. Dr. Roggli then was asked to look at the CT scan discussed above that was read by Dr. Duff, and confirmed that parenchymal scarring is caused by asbestos exposure. Dr. Roggli then looked at the operative report by Dr. Sharma and the findings of "The apical and anterior portions exhibited marble like calcification typical of asbestos exposure" as discussed above. Dr. Roggli stated that if these findings were accurate, then it "ups the ante a little bit that the scarring may be asbestosis." Dr. Roggli stated that with these findings, one needs to look at the history of exposure to see if it is sufficient. At no point did Dr. Roggli deny that plaintiff had sufficient exposure to asbestos containing materials to cause this asbestos related cancer. Dr. Roggli was unwilling to confirm that decedent's lung cancer was asbestos related because there was no tissue from the parenchyma of the lung to study.
24. Defendants denied this claim on November 11, 2004; however, they did not provide Dr. Roggli any material to evaluate this claim until November 15, 2005, more than a year after they denied the claim.
25. During the last full year of decedent's employment with defendants, his annual income was $17,883.30, thereby yielding a compensation rate of $229.27 per week.
26. For the period from October 1, 1998 through November 1, 2000, defendant-employer M-Tec Corporation d/b/a Southern Engineering was insured under a workers' compensation liability insurance policy issued by Reliance Insurance Company ("Reliance").
27. Reliance was declared insolvent on October 3, 2001 in an order of liquidation entered by the Pennsylvania Commonwealth Court. The Pennsylvania Commonwealth Court set December 31, 2003 as the deadline for the filing of claims and proofs of claim against the estate of Reliance in liquidation. *Page 14 
28. Following Reliance's insolvency, the NCIGA activated to fulfill its statutory obligations pursuant to the requirements of the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1,et seq. (the "Guaranty Act").
29. Decedent was diagnosed with asbestosis on November 5, 2002.
30. On August 6, 2004, decedent filed a Form 18B with the Industrial Commission for his asbestosis.
31. By letter dated January 24, 2005, a copy of decedent's Form 18B and diagnosing medical records were provided to the NCIGA.
32. After confirming that no claim had been filed with either Reliance in liquidation or NCIGA prior to December 21, 2003, NCIGA filed its Form 61 Denial of Workers' Compensation Claim with the Industrial Commission on March 7, 2005.
33. Prior to January 24, 2005, no claim, proof of claim, or notice of claim was filed by plaintiff with either Reliance in liquidation or NCIGA.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent's lung cancer resulted from causes and conditions characteristic of and peculiar to his employment with defendant-employer and is not an ordinary disease of life to which members of the general public not so employed are equally exposed, and was, therefore, a compensable occupational disease. N.C. Gen. Stat. § 97-53.
2. Decedent's last injurious exposure to the hazards of his occupational disease occurred during his employment with defendant Salprep II d/b/a Southern Manufacturing, who *Page 15 
was then purchased by M-Tec Corporation d/b/a Southern Manufacturing. and decedent was employed from October 10, 1995 until July 31, 1999.
3. Defendant NCIGA is a non-profit, statutory association arising and existing pursuant to the requirements of the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1, et seq.
(hereinafter the "Guaranty Act"). 4. Pursuant to the Guaranty Act, NCIGA is only "obligated to the extent of the covered claims . . ." arising from an insurer insolvency, N.C. Gen. Stat. § 58-48-35(a)(1) (2003), and is only "deemed the insurer to the extent of the [NCIGA's] obligation on the covered claims. . . ." N.C. Gen. Stat. § 58-48-35(a)(2) (2003). As a result, a claim against the NCIGA must meet the requirements of a "covered claim" in order for the NCIGA to have any payable statutory obligation under the Guaranty Act for the claim. See Vogler v. BranchErections Co., 181 N.C. App. 457, 640 S.E.2d 419 (2007).
5. N.C. Gen. Stat. § 58-48-35(a)(1) sets forth the obligations of the NCIGA with respect to "covered claims" under the Guaranty Act and states in relevant part:
 Notwithstanding any other provision of this Article, a covered claim shall not include any claim filed with the Association after the final date set by the court for the filing of claims against the liquidator or receiver of an insolvent insurer.
6. Under North Carolina law, a statute clear on its face must be enforced as written. Bowers v. City of High Point, 339 N.C. 413, 419,451 S.E.2d 284, 289 (1994); Burgess v. Your House of Raleigh,326 N.C. 205,209, 388 S.E.2d 134, 136 (1990) ("where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning.").
7. The language of the Guaranty Act's bar date provision is clear and unambiguous. Although North Carolina's rules of statutory interpretation have not been applied to this plain *Page 16 
and unambiguous language of the Guaranty Act, similar rules have been applied to similar statutory language in other states. See Medical Mut.Liab. Ins. Soc'y v. Goldstein, 879 A.2d 1025 (Md. 2004); Whitehouse v.Rumford Prop. and Liab. Ins. Co., 658 A.2d 506, 508 (R.I. 1995).
8. Under the plain language of the Guaranty Act's bar date provision, plaintiff's claim is not within the NCIGA's statutory obligations. The Pennsylvania Commonwealth Court set December 31, 2003 as the deadline for the filing of claims and proofs of claim against the estate of Reliance in liquidation, but plaintiff did not file his Form 18B with the Industrial Commission until August 6, 2004. There is no dispute that prior to August 6, 2004, no claim, proof of claim or notice of claim was filed by plaintiff with Reliance or NCIGA. As plaintiff failed to file his claim timely as required by the Guaranty Act, his claim cannot be a covered claim and the NCIGA has no statutory obligation for the claim. N.C. Gen. Stat. § 58-48-35(a)(1).
9. Under North Carolina law, where statutory language is clear, courts are without power to interpolate or superimpose provisions and limitations not contained in the statute. Underwood v. Howland,Comr. of Motor Vehicles, 1 N.C. App. 560, 563, 162 S.E.2d 124, 126,rev'd on other grounds, 274 N.C. 473, 164 S.E.2d 2 (1968). TheUnderwood court, when faced with the interpretation of a statute stated the following: "It is our duty to adjudicate, not legislate; to interpret the law as written, not as we would have it. We are compelled to interpret the statutes, including [the statute at issue] as written, leaving to the General Assembly the responsibility of writing and amending statutes." Id.; see also State v. Arnold, 147 N.C. App. 670,673, 557 S.E.2d 119, 121 (2001) ("It is critical to our system of government and the expectation of our citizens that the courts not assume the role of legislatures. However poised and eager we may be at times to launch our agenda, judges have not been entrusted by the people *Page 17 
of this State to be legislators."); Jarman v. Deason, 173 N.C. App. 297,299, 618 S.E.2d 776, 778 (2005) ("it is not the province of this Court to superimpose our own determination of what North Carolina's public policy should be over that deemed appropriate by our General Assembly.").
10. Furthermore, the General Assembly is always presumed to act with full knowledge of prior and existing law. Knight Publ'g Co. v.Charlotte-Mecklenburg Hosp. Auth., 172 N.C. App. 486, 492,616 S.E.2d 602,608, disc. review denied, 360 N.C. 176, 626 S.E.2d 299 (2005). In this regard, the Guaranty Act's bar date provision was initially added by the General Assembly in 1989. In 1992, the Guaranty Act was amended to obligate the NCIGA, for the first time, for workers' compensation claims involving insolvent insurers. The 1992 amendments to the Guaranty Act added provisions to N.C. Gen. Stat. § 58-48-35(a)(1) addressing workers' compensation. Nonetheless, the General Assembly re-enacted this section without changing the Guaranty Act's bar date provision, and created no exceptions for any kind of workers' compensation claims.
11. The NCIGA is not the legal successor of the insolvent insurer, and the NCIGA's statutory rights and obligations under the Guaranty Act are not co-extensive with the contractual obligations agreed to by the insurer prior to its insolvency. See City of Greensboro v. Reserve Ins.Co., 70 N.C. App. 651, 664, 321 S.E.2d 232, 240 (1984). The NCIGA is only obligated for claims under policies of workers' compensation insurance to the extent of "covered claims" that fall within the scope of the NCIGA's statutory obligations under the Guaranty Act. N.C. Gen. Stat. § 58-48-35(a)(1).
12. In applying the plain and explicit language of the Guaranty Act's bar date provision to the facts of this case, the Commission is mindful that our decision will leave plaintiff without the NCIGA as a source of recovery for his claim. While we believe that this is *Page 18 
not a desirable outcome, nonetheless, the NCIGA, as a creature of statute, must comply with the clear provisions of the Guaranty Act that define its powers and duties. The Industrial Commission cannot employ equitable principles to circumvent valid legislative enactments by the General Assembly and must apply the statutory bar date provision to the facts of this case.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant NCIGA is not liable for any compensation payable in this matter.
2. Each side shall bear their respective costs.
This 16th day of July, 2008.
 S/___________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1